Good morning, your honors. I'm D. Dangaran, they, them pronouns for the plaintiff appellate, Mr. Elijah Kaneakua. Kaneakua? Kaneakua, yes. I'd like to reserve three. I can't imagine how much time I've practiced this week trying to get these names right. Go right ahead, please. Yes. So there are two issues in this appeal. The Bivens step one new context analysis and qualified immunity. First, the various factors that the district court and the defendants have relied on to do not make this case meaningfully different from Carlson v. Green. This court's published decisions in Watanabe v. Derr and Stannard v. Dye both support a conclusion that Mr. Kaneakua's Bivens claim is in the same context as Carlson. Second, this court should not reach qualified immunity right now on appeal of the motion to dismiss with no district court decision on the issue, given that there are disputed facts. If this court decides to reach the issue, it should hold that defendants do not have qualified immunity. Both defendants delayed Mr. Kaneakua's necessary care by not providing him with a prompt specialist consultation after being on notice of his serious medical needs. This court's opinion in Jett v. Penner, it clearly establishes the unconstitutionality of both a medical official and a warden who delayed in providing necessary medical care. While this court should not permit defendants to incorporate medical records into this appeal, those records actually support Mr. Kaneakua's position, particularly in light of Jenner. This court should reverse. I'll start with the antecedent Bivens question, but I hope to spend the bulk of my time on qualified immunity because there are a few interrelated issues there. First, Egbert discussed alternative remedial schemes as a step two consideration. This court so held and understood in Watanabe. So the district court's discussion of the administrative remedy procedure at step one was erroneous. There are seven different factors discussed by the district court and defendants with some various analyses. So the district court's step one factors were severity of the harm or injury and the duration of the harm. Both Watanabe and Stannard have held as a categorical claim or categorical issue that these ... When you say the district court's step one factors, you mean the factors the district court relied upon to decide that this was a new context. Yes, Your Honor. So Watanabe and Stannard discussed difference of degree. Watanabe discussed severity explicitly. So those factors, because of those precedents, should not be used to show a meaningful difference here. The defendants point to some different factors that the district court did not discuss, three of which have already been addressed by this court's precedents and two that are arguably new. So I'll start with those already addressed. Before you get there, can I just ... Before you dive in, I think you're going to talk about the seven factors. I'm interested in talking about the decision tree and in particular the district court's comment that the step two factors have collapsed and it's really a one step test. Could you speak to that? Yes, Your Honor. So Watanabe discussed exactly that already and so this court should not change that analysis. The administrative remedy procedures, if that was a part of step one, it would mean every single Carlson claim would be found in new context and that cannot be the case because the court in Egbert upheld Carlson as precedent and because the court in Egbert actually used a two step process. So the discussion in Egbert is dicta, just speaking to the general principles of how the ARP is actually ... Or rather, how the special factors are considered. There has ... Forever there's been this discussion of the guiding principles of the separation of powers in the Bivens analysis. I have to say, I long ago learned that it is dangerous to dismiss a Supreme Court statement as dictum. Yes, Your Honor. The Supreme Court did use the two factor analysis. So again, the discussion of those principles are found far before Egbert and so Egbert was entirely a step two case. So I say dictum only because it was quoting principles from cases as old as Malesko. In Abbasi, the two step analysis provided in Abbasi has not been displaced. The district court did not have the benefit of our decision in Watanabe. Correct. My guess is that Watanabe, had it been on the books at the time the district court decided it, this case would have come out the other way. Watanabe's pretty clear and it seems to me that your case is almost directly on point. I agree, Your Honor. So there are some things that Watanabe, as I said, actually already decides and those factors include this two step question, but I'll move to some of the other factors now, Your Honor, if I've answered your question fully. So defendants point to the systemic BOP practices. They list medical, administrative and coordination with outside providers. Carlson included administrative defendants up to the head of BOP and Watanabe and Standard both included outside specialists. So this is not a factor that should create a new context. They point to the transfer to an outside hospital specifically that that transferring creates a new context, but Carlson included a transfer to a hospital. That was the need that was required and Watanabe also dealt with an outside specialist transfer, so to speak. And finally, they point to the generality or specificity of the conduct. Here it's a delay claim. Carlson included a delay claim. There was an eight hour delay in providing necessary care and so that's not a new context either as Standard and Watanabe have pointed to. So the two arguably new factors are this resource allocation or triaging idea and the argument that the warden is improper is a different kind of actor. That one I think is easiest. Sorry, the warden what? They argue that the warden is an improper defendant and that's a new context and it's not because there was a warden as a defendant in Carlson. But the resource allocation point is discussed, I think, in the Seventh Circuit decision in Brooks. I think there was a warden at the outset of Carlson, right? And there was improper service? I'm not certain, Your Honor. I do think that the warden... I have your position on that. Okay, thank you. So every prison medical care case must take into account this administrative idea of the resource allocation and the triaging. In effect, this argument is saying that, again, Carlson should be overturned sub silencio despite the Supreme Court upholding Carlson as a Bivens context. Jett v. Penner... The Supreme Court upholding Carlson in a Bivens context. They decided Carlson quite some time ago. The district court, and then, as you know, Bivens has fared sort of on life support. That was the district court's concern. He was very upfront about that, right? He said the handwriting's on the wall. What do you think we ought to do about that if we are convinced that the Supreme Court would not decide Carlson the same way today? The key point, Your Honor, is that Egbert has continued to say, and Egbert's the Supreme Court's last statement on this, that Carlson remains one of the three clearly established Bivens precedents. And so Carlson is not dead until the Supreme Court says so, and this court could not reach that issue and say that it is. No court can do that. And so the writing on the wall idea is actually in tension with the Supreme Court in Egbert saying Carlson's good law. So we're just waiting for the qualified doctor to come around and declare the patient dead, even though the patient's not breathing? I mean, yes. I think that that's kind of an issue here. Egbert has prevailed and Carlson claims survive, even if it's kicking. Or a different answer would be that we as a three-judge panel, I think we're governed by Watanabe. Exactly, Your Honor. So in Jett, I'll just point out at page 1097, quoting this court's decision in McGuckin, Jett said, the state's responsibility to provide inmates with medical care ordinarily does not conflict with competing administrative concerns. Counsel, could you, you went past something kind of quickly in response to Judge Fletcher's question, which is at the top of my notes. The district court didn't have Watanabe. Watanabe is pretty well on all fours with your case. Aren't we bound? Bound by? We'll stop by our own precedent. Yes, Your Honor. I think that you are bound by Watanabe here. Can you move on to the qualified immunity argument? Yes. Okay, so... You said at the top of the decision tree that you thought we ought not reach qualified immunity. Yes, and that's under this court's precedent, Coit's v. Keele. So the qualified immunity analysis takes as true only the allegations in the plaintiff's complaint. You're arguing in the event we do decide to reach it, here's how you would like us to decide it. Yes, Your Honor. So step one is, is there an allegation of a constitutional claim on merits? I'll start with the defendant's liability, because I think that's a big question. This may help you at least address my concerns here. Do we look at this as, is it clear that there was a constitutional violation? Or do we look at this in terms of, is it clear that there is a Bivens remedy for the constitutional violation? Because there may be a different answer to those two different questions. Yes. I think for the qualified immunity analysis, the Bivens question has been met. So Bivens is an antecedent question. Once that's resolved, the rest of the cases open up for the qualified immunity analysis. I hope I answered your question, Judge Fletcher. Although I might say it a little differently, and maybe I'm talking to the other side as well. Qualified immunity really is about giving fair warning to the people who are on the ground acting. And if they're not given fair warning as to whether something is constitutional or unconstitutional, we give them qualified immunity. On the other hand, if the constitutional rule is clear, they've been given fair warning. Yes. So I would view the question as to whether or not the constitutional right is clear rather than whether there's a Bivens remedy for a violation of the clear constitutional right. I agree totally. That's addressed to you when you get up there. So there's a 2006 decision that makes this clear in Jett v. Penner, but I'll start with a step one analysis because I don't want to skip it. So Dr. Kwan is one defendant and Jordan Dare is the second. The complaint was filed April 29, 2022. So our statutory damages window here is April 29, 2020 to April 29, 2022. We concede injunctive relief is moot. Dr. Kwan did not provide the necessary care from 2020 through Mr. Kaneakua's transfer out of FDC Honolulu in spring 2021. That's about a year. That's at ER 27. Dr. Kwan saw Mr. Kaneakua in January of 2022 when he's back in FDC Honolulu. And we argue, based on the complaint, that he informed Dr. Kwan in that conversation of severe pain and requested immediate treatment. Can I ask you about that? You're now doing a factual recitation. Of course, we're at the 12-year level. So are you limiting yourself to the complaint, the allegations in the complaint, or are you incorporating any of the medical records by reference? So I argue that we should limit, the court should limit itself to the complaint. Right, I appreciate that. So I just want to make sure that what you're arguing is just from the complaint. Yes, yes, that is. And I'll turn to the incorporated records next. So based on, and Mr. Kaneakua also argues that Dr. Kwan did not give him pain medication. That's the disputed fact. The plaintiff's complaint says, I did not receive that. Defendants have pointed to records attempting to say that he did. And again, no timely consultation. As to Warden Dare, the complaint alleges that Warden Dare failed to provide immediate medical attention by not granting the medical grievance and trivialized the medical issue, the pain and the suffering he was in, and didn't grasp how urgent it was. And that's at ER 27. So I think that on those facts alone, he has established a clear Eighth Amendment deliberate indifference claim for that delay in medical care. Taking the medical records into account is an argument that I don't know that Mr. Kaneakua was equipped on pro se below to make this argument in his opposition brief, though he did not make an opposition brief at all. But on appeal, we argue that under Ritchie, this court's discussion of Ritchie, the documents can only be incorporated by reference if the plaintiff refers extensively to them, and or the document forms the basis of the plaintiff's claim. Mere mention is not enough, is what Ritchie says. And so because these records are not integral to Mr. Kaneakua's claim, they should not be taken into consideration. The records are both under-inclusive and over-inclusive. They do not show the care between 2020 and spring 2021, nor anything regarding the March 16th appointment that is referenced in the grievance response at ER 31. They contain the January appointment with Dr. Kwan, but nothing between that appointment and our filing date of the complaint. And so that's why they're under-inclusive. They are over-inclusive by bringing in material from far outside the scope of this damages claim. They go all the way through November 2022. And so Mr. Kaneakua's position is that you can't use general references to simply the fact that the warden and Dr. Kwan were aware of his diagnosis of this cyst, to bring in all the medical records about it, including after the date of filing the complaint. Counsel, you just have two minutes left. Would you like to reserve that time? Is this two minutes for this section only or for the whole time? I'll go into it just for this final point, Your Honor. You have two minutes left, so are you going to have a rebuttal? Yes. Then you're going to have to reserve time for that. Okay. Thank you, Your Honor. Not at all. We'll hear from the government, please. Good morning, Your Honors. May it please the Court, Sidney Spector representing the appellees, Warden Estella Dare and Dr. Nathan Kwan. Kaneakua is seeking to hold two individual Bureau of Prison Employees personally liable for damages for a delay in him receiving an outside consultation with an ear, nose, and throat specialist for treatment of his cyst. Dr. Kwan, the treating physician, he ordered an outside consultation with an ENT upon meeting with Kaneakua before he was transferred to FCI Sheridan in 2020. Also, a few days after, he was transferred back to FDC in Honolulu. Such circumstances are meaningfully different from where personal liability was recognized as a possible cause of action in Carlson. Excuse me. Are you arguing that this case is distinguishably different from Watanabe? Yes, Your Honor. In Watanabe, which is currently pending a petition for rehearing on Bonk in this court, this court rejected the arguments that a difference in nature and severity of an inmate's injuries created a meaningful difference and that the BOP's administrative remedy program alone rendered that case a new context. That's not what we're arguing here. Here, the new context is because recognizing Kaneakua's claim would require a novel intrusion into BOP's systematic management of medical care. Why is that? In Watanabe, if I can talk about the facts there for a second, the claim that was recognized as not meaningfully different from Carlson was against a line nurse who allegedly told the defendant to stop being a crybaby about his complaints about a broken . . . It's a long delay in getting the care, right? There was the beating, the long delay before there was a recognition of the injury, and there's this remark from the . . . Stopping a crybaby and a refusal to refer him to a hospital. Here, the facts are different. Here, it's not disputed that Dr. Kwan did make a referral to an outside specialist, and the delay here is caused not by something within Dr. Kwan's control. I think it is. Can you back up before you say that that's not disputed? Because I read that a little bit differently. He wrote, and again, he's pro se, but he wrote that the response he got was not truthful. He begged to differ. He said if that appointment was to be April 7th, I'm now filing on April 17th. This has not materialized. They're not getting me the help I need. I am paraphrasing, of course. So is it really undisputed? Yes, Your Honor. I understand that that fact, I agree, is disputed in particular. He says that they didn't get him the care that he needed. They didn't get him set up for an outside consultation. Isn't that the issue you're going to here? At ER 26, which is the cause of action page of plaintiff's complaint, Kanekua says that he was awaiting outside consultation for a preauricular cyst, which I take that to mean that... Oh, and he says that he was on medical hold at the time he was transferred, which I believe or I take to mean that he understands that he was referred to an outside specialist at the time that he was transferred, presumably by Dr. Kwan, although I don't know who did that exactly. In ER 27, when he's detailing the issues with the warden's response, he alleges that the consultation was removed from his record. He doesn't necessarily dispute that the consult request was made. From Dr. Kwan, we don't have the allegations, at least as pled, in this complaint, which I understand he's pro se, but you still need to be guided by the complaint. He's alleging a delay that's outside Dr. Kwan's control. He made the referral, then he was transferred to another prison, which he says he shouldn't have been transferred in the first place. I don't read the complaint as encompassing the period of time. I think it's about six months when he was transferred to Sheridan and back. I would grant you that that would be problematic, but I don't think that's what he's saying, and he's pro se, and he disputes that they got him the referral. I read this as a contested point. Respectfully, Your Honor, I disagree. He said he never reported that it was a congenital condition and these records are not truthful about what he reported. To the extent that he's bringing a claim about records not being truthful, which I think is definitely true of his claim against Warden Dare that she did this improper investigation and relied upon improper records, that is a far cry from the context of Carlson, which is holding direct providers liable. It depends on how granular you want to get. Again, it's a pro se complaint. We're looking at Watanabe, which is our binding precedent, and this is an inmate who says he's got this painful condition, and he's requesting care, and he's not getting it, and he's not getting it. Your strongest argument, this is the new context, is what exactly? My strongest argument is that this is a new ... It can't be. Plaintiff wants you to hold that all, after Watanabe, all deliberate indifference claims brought by inmates related to failure to provide medical care are cognizable as Bivens' actions, and that simply can't be the case. Why can't that be the case? I can understand if you make an argument that says, well, this is not a valid deliberate indifference claim. I get that, but assume that it's a valid deliberate indifference claim. Are you trying to differentiate among deliberate indifference claims? Some are okay, and some aren't? Help me understand what you're arguing. Yes, Your Honor. I think it's absolutely true that some deliberate indifference claims, such as this court held in Watanabe, can proceed as cognizable Bivens' actions because they're not meaningfully different, but this court also recognized in Chambers v. Herrera, which is, I'm fairly certain, also postdated Egbert's most recent holding about how stringent we should be about this analysis. In Chambers, which was a broken wrist and a broken arm, the court did not hold that that was cognizable as a Bivens' action necessarily. Instead, it remanded it for further factual pleadings to determine whether it was... Did it remand because it was not well established on that record as to whether or not there had been deliberate indifference and a constitutional violation? No, Your Honor. The remand order said even though a plaintiff brought an Eighth Amendment claim, other Egbert factors need to be addressed to determine whether the claim arises in a different context than Carlson. Are you arguing that that case is inconsistent with Watanabe? I'm reading Watanabe as a governor, our deliberations here. No, I believe they're consistent, Your Honor. I think Watanabe can be read to say that a difference in... to the extent that the district court's decision was based on this isn't a life-threatening injury here, this is about a cyst, and Carlson is about asthma resulting in death, or that this took place, this is about a delay over a series of years, and, you know, Carlson was a submerged in an eight-hour situation. I'm saying Watanabe forecloses that, Your Honor. I don't want to cut you short, and I don't want to put words in your mouth so you can disagree with what I'm attributing to you. I think your argument is there are very serious deliberate indifference claims, and they survive. There are deliberate indifference claims that are valid, but the injury's not so bad, and they don't survive. Is that your argument? No, Your Honor. My argument is that when a plaintiff pleads a deliberate indifference Bivens action, it presents a new context from Carlson, such as here, which is that the gravamen of the complaint is this two-year delay, which is due to... it's not alleging individual misfeasance against Dr. Kwan or Ward and Dare. Those facts would also go to the merits, which I think is what you're getting at, but it's implicating various policies that are outside those individual defendants' control.  I'm not understanding your answer to my question. It still seems to me you're trying to differentiate between really serious deliberate indifference claims and not very serious deliberate indifference claims in both of which, however, there is deliberate indifference. Let's have deliberate indifference to a fairly minor condition, but it nonetheless amounts to cognizable deliberate indifference. Does that survive? Can that claim go forward? The reason it's relevant to this analysis is because routine... That's a yes or no. But does the fairly minor deliberate indifference claim that is nonetheless deliberate indifference, does that claim go forward? I think the answer is it depends, and probably not because those claims are the sort of claims that are more likely to present intrusion from the judiciary into the functioning of the executive branch. So I think if you're making the argument that there are serious deliberate indifference claims that can go forward and some not very serious, but nonetheless deliberate indifference claims that cannot go forward, that was the position of Judge Smith and dissent in Watanabe. We rejected that. Correct, Your Honor, but I'm not arguing... Watanabe was framed in terms of nature and severity in and of themselves, and that's not what I'm arguing here. So you're arguing that this case somehow represents a greater intrusion into the policy choices made and the administrative choices made in the very difficult job of running a prison. That's what I think you're saying. Absolutely, Your Honor. That's helpful. So how does this case represent any greater intrusion than Watanabe? So this case involves... Dr. Kwan made the outside referral, and it involves delays caused by prison transfers, availability of outside specialists. It's not a hospital situation where you just show up. Excuse me, can I stop you? Because you keep starting from the premise that the referral was made. Sure. But I thought a minute ago you agreed that that's actually a contested fact about whether he actually made the referral, because the plaintiff argues that that didn't happen, that they're saying now, after the fact that, you know, that I was supposed to have an appointment on April 7th, and here it is on April 17th, this isn't happening. Your Honor, I think it is disputed whether there was some appointment on April. That April appointment, I believe, is in dispute, but I think it's undisputed that Dr. Kwan made the outside... the referral to a specialist. Well, that the referral didn't happen is what I'm getting at. My question, and I'm trying to follow up with Judge Fletcher, and I'm not trying to ruin your day, I'm trying to get at this. You think this case would represent a larger intrusion into the administrative decisions of a very challenging job of trying to run a federal prison, and I appreciate that, and that's your argument about why this is a new context. I'm just trying to figure out why this is different than, you know, represents a greater intrusion than Watanabe. And if he's arguing, they didn't get me the outside care, why is this different? Because Watanabe dealt with, one, I don't believe the prison transfers were an issue, and they weren't alleging things that were outside the control of the individual defendant in that case who the claim survived against. I believe there were other defendants at first, but the surviving claim was against a line nurse who said, stopping a crybaby, I'm not referring you to the hospital. Well, he was complaining about pain. Now we're talking about Watanabe, right? He was complaining about pain. He had this beating in prison. I think he was put in solitary confinement for an extended period of time. It took a long time for him to get... And then sort of at the tail end of that sequence, there was this very callous statement by a nurse. But I think that the gravamen... We have a difference of opinion about how to pronounce that word. See? But I think the substance of that claim really has to do with, they didn't get me the care, right? They didn't get me the care. I think it really feels like, you know, microscopic level about... that I don't think is correct according to our case law. But that's why I'm trying to figure out why this is a larger incursion. Well, I think it's because whose fault is it that he didn't get the care? It may not be a successful claim. We're just trying to figure out whether or not it can go forward. Exactly, Your Honor. And in our view, Kinnick, who is trying to hold Dr. Kwan and Warden Dare liable, personally liable, for things that are simply outside their control and rely on a host of actors besides themselves...  Would you change your view in terms of the argument that you're making if we construe the complaint to be alleging the same deprivation of care that... Because I think the distinction you're drawing is with respect to these policies that are outside the control of the two defendants versus the claim, the direct allegation, that he was denied treatment. And if we disagree with you that this looks much more like, especially if we liberally construe the complaint to include sort of a deprivation of treatment, would you then agree that this is on all fours with our most recent decision in Watanabe? I think if you frame the complaint generally as a deprivation of treatment and ignore the fact that this referral was made, if that's all irrelevant, I think it's more similar. But I think you still need to look at the fact that allowing this to proceed as the same context of Carlson would be exposing BOP doctor to be personally liable for things that are outside of his control in this claim. That's why it may not be a successful claim. But I think that is meaningfully different, and that's what we're all trying to tease out. Right. And, you know, I understand that this... I think the court is concerned that why shouldn't we recognize a claim and then maybe we evaluate the merits and a weaker claim... What we're concerned with is, aren't we bound by precedent? I'm going to say that loudly and clearly. Respectfully, Your Honor, I don't see Watanabe as issuing a... such a broad holding that all straightforward medical care claims brought by line officials are Carlson context. And I know that... I mean, that's explicitly what plaintiff argues on page 10. So let's say we disagree with you and we hold under our precedent that this is not a new Bivens context. Should we reach the qualified immunity question at the 12B6 stage, especially given that the district court did not reach it in the first instance? Yes, Your Honor. I believe it's very clear that this court could assume without deciding that a Bivens remedy exists and could affirm on the grounds that Dr. Kwan and Wargandere has not established clearly violated law. And I would urge this court to look at... Would we have the same answer if we were to consider the qualified immunity question and hold that the medical records are not incorporated by reference and therefore qualified immunity should be denied at this stage? Yes, Your Honor, because I don't see any prior cases that would... Again, I think the referral is very clearly in the record in the first instance that he says he alleges he was on medical hold while he was awaiting consultation for a preauricular cyst. And I think in those sort of situations, you know, there's nothing clearly established the plaintiff has pointed to that would show Dr. Kwan that he would be violating clearly established law by doing what he did. And the same for the warden in relying upon medical records and responding to a grievance. I just have one other question. The district court did not have Watanabe. And I don't think your brief response to... or suggest that it was correct to treat this as a one-step test, to collapse the test. But I just want to make sure I have the government's position on that. Correct, Your Honor. We believe a two-step test is appropriate. Okay. Thank you for your patience with our questions. Anything else? I think we're done. Thank you. Thank you so much. Okay. I'll start with the complaint. At ER 26, Mr. Kaneokua says that his injury is extreme pain without any treatment since 2020. So that is, I think, to Judge Desai's question, the proper way to view his... Do you think it's correct to scoop in and include the time that he was transferred to Sheridan? No, we are not including Sheridan. It's the time before Sheridan, when he was in Dr. Kwan's care. And after. Exactly. Because we just scraped the surface of the qualified immunity in defendant's argument, I wanted to point out a couple of things about the medical records if this court decides to reach them. First, in Jett v. Penner, there's a very important discussion of routine consultations versus urgent consultations. The records support Mr. Kaneokua because there was a routine consultation created by Dr. Kwan on January 20th. In Jett, a routine consultation was created, there were x-rays provided, pain medication was provided, and there was still deliberate indifference because it was an urgent issue that did not receive that urgent consultation. It's notable that the records also show at S.E.R. 46 that after filing his complaint, Dr. Kwan did put in an urgent consultation and that began the treatment he then started receiving after this statutory period of his damages claim. Prison doctors often don't have the resources they need. I think probably it's not going out on a limb to say usually don't have the resources they need or wish they had to be able to respond to patient care. It strikes me that there's a whole lot of questions of fact here that we're at the 12B6 level that we can't know about what Dr. Kwan did or didn't do or what he had available even within his power to do. I just want to make sure that I'm clear that your first response was don't reach qualified immunity and your second one is that if we do we should only look at the allegations and the complaint. If so, that seems to sell Dr. Kwan short because he's got another side to this story about what he did or didn't do. Do you want to respond to that briefly? Yes, and so that leads to our third position I suppose of what Dr. Kwan did and did not do which is Dr. Kwan put in a routine consultation and the urgent consultation is what was required and so the necessary care as JET supports for the qualified immunity analysis, the necessary care was an urgent consultation and the pain that he was experiencing throughout that period is what he's going forward on a damages claim for. We've extended your time. Judge Tsai, anything further? Judge Fletcher? I think we've got your arguments both of you. Thank you so much for your important attention to this case.
judges: FLETCHER, CHRISTEN, DESAI